Mr. Brewer? Yes, Your Honor. Good morning. You may proceed, sir. Thank you, Your Honor. May it please the Court, my name is Bryce Brewer and I'm here today on behalf of the family of actually it's the Special Administrator Jimmy Gladden individually on behalf of the family members of the late Bradley Scott Gladden and we are here today on an appeal, Your Honor, and we are asking this Court to reverse the District Court's ruling granting summary judgment on our claims of 1983 Arkansas Civil Rights and the Arkansas wrongful death as we ask that there are at least 24, as we cited in our brief, at least 24 material facts in dispute in this matter, Your Honor, and we ask that this case be remanded back down for a trial to determine that matter, Your Honor. The first thing that we asked about is we go back to, first of all, the part of what's custody and both parties here in this argument spend a significant amount of time determining what is and is not custody here and what we have here, first of all, is anybody that's in the custody has a substantive due process right to be taken care of and be protected when they're in custody. Let me interrupt. Mr. Gladden asked to be transported in this police guard. If he did, how can he say, how can it be argued that he was in custody if he voluntarily placed himself into the situation that he had requested? Your Honor, let me answer the question and the facts as we best know them at this point in time, Your Honor. Three days before this incident, Sergeant Bibb. You're talking about the Bibb officer? Yes. Well, I'm glad you're developing that. In other words, are you arguing that that placed all police officers, especially these, did these officers know about it? Yes, these officers knew about that. They were under a continuing duty to once they took him into their, call it custody or their encounter with him, they had, they were now under an obligation to transport him somewhere. Your Honor, that's part of where I'm going with this is, is the department has had a long history with the decedent. He had a substantive alcoholism, numerous public intoxications. In fact, this was, while this was Officer Richbord's first encounter with Mr. Gladden, this was not Officer Emhoff's first encounter with Mr. Gladden. And when Mr. Richbord called in asking for a background on this young man, he found that obviously his driver's license had been suspended and there was numerous public intoxicants. But in the email 72 hours prior, Your Honor, which I think is important here, the court says, and if you'll give me a second to get to that and then I'll come back to your answer there, Your Honor, I apologize. He says in there that the department was asking that Form 925 be filled out for more in depth on a public intox because Mr. Gladden was incompetent. Let's shortcut this a little bit. Is it your argument now that the constitutional right that was given to Mr. Gladden should not be the constitutional duty of these officers to take him to some place other than where they left him? They should not have taken him to where they left him. Yes, Your Honor. And I'm thinking at this point in time they had a duty to protect Mr. Gladden. For one part, that email to these officers telling them that we're going to civilly commit him, let them know that Mr. Gladden was not competent to make decisions on his own. And so when at that point in time at the Waffle House, when the phone call came in by Ms. Snowden saying that we have an individual drunk who's been in here for several hours making a scene, these officers were dispatched out to that call. When they got there, they asked Mr. Gladden to leave the Waffle House and join them outside. Officer Richport did a pat down, discovered an unopened bottle of whiskey, and during the course of a conversation there, Mr. Gladden did in fact say that he wanted to make a phone call, but was not permitted to go back into the Waffle House. And he said he wanted to go home. The statement said he wanted to go into Lone Oak. That's the testimony into the record here, but whom would he have called? His own sister wouldn't come to get him. He wanted to make a phone call to his sister is what my understanding of the testimony is that he wanted to make. However, Your Honor, he wasn't allowed to even make that phone call to get the determination of whether or not the sister was going to come get him or not. He was never allowed to go back in the Waffle House. Furthermore... Is there a constitutional right to make a phone call? Only if you're in criminal custody, I would guess. Your Honor, the point that I'm making is Mr. Gladden was in their custody, and he was not allowed to go back in to make that decision. He didn't have the opportunity to leave the premises on his own. He didn't have the opportunity to go into that Waffle House. He was under their dominion and control when they took him from the Waffle House, did the pat-down. He had plenty of time to call while he was in there. I viewed that video. He came in, he went out, he talked to people, he went out. Why could he not have called by himself? The city's own expert, Your Honor, when you look at that in there, did his extrapolation back at the time that the officers were called. What the argument was, he was so intoxicated he was incapable of making a coherent phone call? I believe that Mr. Gladden was incoherent to the point... Well, the people who were there said he was drunk, but not as drunk as he usually was. They did say he was drunk. However, there is no public... There's no public phone in that Waffle House. He had to ask them for permission to use that, for one. But he didn't make that phone call. If the officers could go in and make that phone call, then they never let him do that, Your Honor. They kept him in his custody, in his control. And the evidence is clear on that, that the officers said, you may not go back and make this phone call. Officer Richbord put him right in to his car and took him out to Lone Oak and effectively into the middle of the country, late at night, and let him out. At a place where Mr. Gladden was apparently pleased to be dropped off? Your Honor, I don't know that Mr. Gladden... Well, I shouldn't say pleased. That was not a correct statement, but he was willing to be dropped off there. Your Honor, Mr. Gladden... Well, he wanted to go... Where did he want to go specifically? What did he think these officers... Where does he think the officers should have taken him? Officer Emhoff, Your Honor, has prior to this had taken Gladden home to his actual home with his sister before in Lone Oak County, Your Honor. They had made that trip before. The department at North Little Rock had, by Chief Bradley's testimony, they had an unwritten policy there. They've had people transported back to Conway before, which is outside the jurisdiction, into Faulconer County before. They had transported people into Lone Oak County before by Officer Emhoff and himself. All right, I know that. I'm trying to get to specifically what was the constitutional right that was violated in this case. Mr. Gladden had a duty to be protected when he was placed into custody and not being placed in danger. He was put in the back of the car by Officer Richbord. He couldn't get out of that car. He was taken to where Officer Richbord wanted to let him off. These two testimonies of the officers, neither one knew exactly where to let him off at, whether it be Kerr Road, Remington Road, but he... he just chose a spot to leave him out, basically saying, here you are, there's a place up there about a half a mile you can go to. This man was impaired, he was drunk, he was known to this department, and more importantly, this department had a duty to protect him because they had told all their officers, we're going to take him in custody and have him civilly committed to help this man. These officers chose not to fill out that form. They chose not to take him in. As we put in our first brief, Your Honor, the statute for public intoxication in Arkansas, Mr. Gladden, by the testimony of the Waffle House personnel, he said he was drunk, he was causing a disturbance at the restaurant, and they called in public, and they called for police. He met the definition to be charged with public intoxication. It's a cold night. These officers could have taken him like they've done many times. They could have taken him down to the hospital. They could have taken him to the Pulaski County Detention Center. They could have even taken him to the state hospital to start the Form 925. Instead, they, as their sergeant had instructed them to do, instead they took him out in the country, let him out at 12 o'clock at night, on a cold December night, impaired under alcohol, and gave him back his own open bottle of alcohol, and left him to his own devices. At least 15 miles from his home, and a good 12 miles from the city of Lone Oak. He was dressed in just shoes, jeans, and a long-sleeved t-shirt and a light jacket. The weather that night, Your Honor, we take in North Little Rock our readings from the airport, and so I'm going to give a range. We know the temperature was somewhere between 25 and 35 degrees that evening when he was let out. His dress, their own expert, if we take the defense's expert as being true, his own dress would allow him to go maybe 6 miles before hypothermia sets in on a known alcoholic like himself, who we know had a BAC of at least .195. We know his BAC obviously was higher than that. He was found with a .34 when they did his autopsy, Your Honor. Mr. Gladden, it's not that they, constitutional deprivationist rights is Mr. Gladden was safe right there at the Proto Junction area. It's a busy intersection. There's multiple restaurants, hotels, gas stations, fast food restaurants that are open 24 hours a day. At Remington Road, where he was left at to his own devices, there's nothing but black darkness. He could have maybe gotten a hotel room. He could have maybe stayed there at any one of those places in that Proto Junction area. What did the officer tell Mr. Gladden about this security place? That you can walk down there and they will let you in? Did you see the aerial view, Your Honor, that was part of the record there in the appendix? I'll ask you if you get a chance to go back and look at that. But what did they point at? Did the officer point out to Mr. Gladden that he could walk down there? He told Mr. Gladden that he could walk up there. You have to go up the exit ramp, Your Honor, and go around a corner. And the Remington plant, Your Honor, if you look at that, they have a metal gate. Was the security facility visible at the point at which Mr. Gladden was dropped off? No, sir. It was not visible from where he could be seen. Does the record show whether he was aware that it existed? Your Honor, I don't know if Mr. Gladden knew it or not. What we know from the record is what Officer Rich Borden testified, that he let him out of the car, because Mr. Gladden could not get himself out of the car, let him out and said, there may be a guard shack up here at Remington Road that you can go to. That's a good half a mile. My question is, if you've driven him that 12 miles from Protho, why didn't he make that other half a mile drive to take him to that guard shack, Your Honor? He chose to let him out there. But let's get back. Ultimately, suppose this would send us back for trial. For your client to prevail on liability, what would the jury have to find? Your Honor, first of all, and I'll reserve the rest of my time for rebuttal at this point. I'll give you a few minutes, but what would the jury have to find? What instruction would the court give them? The jury, first of all, has to determine that Bradley Scott Gladden was intoxicated and in the dominion and control of the North Little Rock Police Department when they transported him there that evening and left him in a deadly situation. And the issue of law would be that that was what? That violated the 14th Amendment. Because it what? Shocked the conscience of the court? Shocked the conscience of the community? Shocked the conscience of humanity? Or what? Your Honor, in this situation, deliberate indifference and shock the conscience can be taken in the same thing because these officers at this point in time, this wasn't a snap decision, Your Honor. They had time to deliberate. And these officers deliberated to choose to take him out there and they left him. This wasn't a quick decision and the fact that we took a human being and put him in the country at night like we do stray animals to the point in time, Your Honor, shocks the conscience and that's what this jury would be charged with asking to find. Well, your enumeration of the elements that you would have to prove at trial began with a finding or proof that Mr. Gladden was intoxicated. That's what you just said. How would you prove that? The officers say they didn't think he was intoxicated. Judge Shepard, that's an issue for the prior fact, Your Honor. We have the testimony of Ebony Snowden that said he was intoxicated. He was singing and laughing and joking and acting in a manner the officers themselves smelled alcohol on him, Your Honor, at their time they got there. Since he wasn't driving a car, Your Honor, obviously, I don't know why these officers chose not to do field sobriety tests, but this is a known person to this department who's a known alcoholic who has an email to these officers says, we know he's a known alcoholic. He has a drinking problem. We're going to civilly commit him the next time we pick him up. Whoever picks him up next, fill out the 925. It said something more than that, didn't it? It said the next time he is taken into custody for public intoxication. And they could have done that here, Judge Shepard. He met the statute definitions for a charge of public intoxication. But aren't you bound? I mean, you understand the dilemma that a plaintiff is in in this situation because the only witnesses are the officers, really, when you get down to the personal interaction here. And it just seems to me that you've got a, it's really a problem for the plaintiff in this situation where the officers state that they didn't believe the man was intoxicated and the only other proof that you have is a videotape. There are a lot of people out on the street that are erratic in their behavior that are not intoxicated. Your Honor, I would, and last thing before I sit down here, Judge Shepard, I would argue that we have three people in that Waffle House who gave statements and would testify that they felt like that Bradley Scott Gladden, to a lay person, was intoxicated on that evening, Your Honor. Furthermore, we have the testimony of both officers that they smelled intoxicants. Your Honor, it would be up to the jury to determine whether or not he was intoxicated at that point in time, Your Honor. It would be up to the jury to determine whether or not he was in custody. And that's what we're asking this court to do, to send it back to let the jury determine those issues. Very well. We'll give you a few minutes for rebuttal. Thank you, Judge. Mr. Wilkerson, good morning. You may proceed, sir. Thank you. May it please the court. The one thing that gets lost in all this is that Mr. Gladden, while maybe someone likes to indulge in alcohol too often, is still an adult and still makes choices and still has rights. Mr. Gladden was not in a position... If he was in a position to make a competent decision, a rational decision... I'm sorry? Was he in a condition to make a rational decision? Yes, Your Honor. Well, nothing in the record indicates that he wasn't. Except his intoxication, perhaps, and the fact that he had been beaten up and deprived of his shoes earlier in the evening? The point in Warden that Mr. Brewer relies on is not a matter of drunk or intoxicated or not. It's a matter of whether he's incapacitated. That's the key. I agree. And we have the employee saying he was intoxicated. You'll say he was intoxicated. Our expert says there's a difference between intoxicated and being over the legal limit, but for purposes of this... Yes, Your Honor. It's a question about whether he was intoxicated, but the point that the expert made is that intoxicated does not equate necessarily to being over the legal limit. He was over the legal limit. That doesn't mean that you're intoxicated, but even setting that aside, the issue is incapacity. And in Warden or in Munger or in Kniep, every one of those people had... Inability to walk was a problem. The court talked about how Mr. Warden, I may be mispronouncing that, had no awareness of what his game plan for surviving that night. He was trying to kick off his own shoes. He was taking off his jacket. Mr. Gladden had shoes on. Wasn't trying to take them off. Had a jacket on. Had a plan to get back to his sister's house, although his sister refused to help him. He was not a danger to himself or others for that matter. He was able to make a decision. He negotiated with the officers. He said, can you give me a ride to Lone Oak? We can't take you to Lone Oak, man. What about the county line? Sure. Alright, grab your stuff if you want to get into the car. And he did. Voluntarily. Which really should set aside the custody issue. I agree with you, Your Honor. That really puts it too far afield for me. And that's really what this does. It's a choice that two officers made between leaving him there, which was a dangerous situation. Ms. Snowden, in fact, agreed that she knew the neighborhood, knew he was an alcoholic, and knew the dangers that he was in if he stayed there. Emhoff said our goal was to get him off Highway 161. So they were trying to get him off that area, get him out of that area. And it's important to note I understand the sister's house is 15 more miles away from Remington Road. But Mr. Brewer is incorrect. Mr. Emhoff never took Mr. Gladden all the way to his sister's house. Mr. Emhoff took him half a mile away from the Remington Road exit. That's where he thought Mr. Gladden lived. Off a street, he said, half a mile down Remington Road. So this isn't an issue in which officers left him out in the country 15 miles away. They didn't know. They thought he lived in that area. And that means they're not deliberately indifferent. That means it doesn't shock the conscience. What about their disregard of this Bibb memo? Bibb, as Judge Shepard pointed out, says that he has to be arrested for P.I. public intoxication. The fact is, when they walked in, he wasn't causing a disturbance. He was talking. I understand that the Waffle House dispatch said that he was refusing to leave. That's all it said. And this is a misdemeanor, too. So an officer would have to go in there, take the word of a dispatcher, which is secondhand, and then arrest somebody without even seeing the crime be committed in front of them. That's a fundamental element of P.I. So Mr. Brewer is asking us to violate Assuming that he was intoxicated to the point that counsel says he was, could the officer have arrested him for public intoxication at that point? I would not want to defend the officer that made that decision. Because the crime did not happen in his presence. What crime? What crime has to be... Did he have to take him into custody under this Bibb memo? Under Arkansas law to arrest somebody for a misdemeanor, the crime has to occur in your presence. And public intoxication is a classy misdemeanor. And plus, the officers, as Judge Shepard noted, they didn't think he was intoxicated. No bloodshot eyes, no wobbly on his feet, wasn't slurring his speech, was able to comprehend the conversation. That's about their testimony now. A jury might look askance at it. I'm sorry? A jury might look askance at it to say, well, they're human, these officers, maybe their perceptions changed after they found out they were being sued. Well, there's no evidence that their stance has changed. The day after, they made the same statement. Most people don't admit that I've changed my testimony. Well, I understand that, Your Honor, and they could disbelieve him, disbelieve them, but they'd be disbelieving them based on nothing. There's no evidence that they made this up. There's no evidence. In fact, Mr. Troy, not Mr. Troy, but Troy in the Waffle House said he was buzzed. It was a six-pack buzz, which for me would be more than a buzz, but he said he was fine. He was drunk, but he wasn't incapacitated. Was he a danger to himself? Snowden, Mr. Poe, Troy were all asked, was he a danger to himself? No, no, no, he was not. And that's the issue. Not whether he was drunk, whether he was incapacitated. How did they know that? Do what? Were these medical people who testified to that? Well, neither are the officers. They're all making gut reactions, and that's the same reaction Who said, did the employees at the Waffle House said, this fellow's not in any danger? They were asked the next day by the North Dakota Police Department. Was he a danger to himself? And they all said no. And the jury's not there, and the jury's going to have to make the same gut reaction that Ebony Snowden... Of course, those questions may not have been framed in the light they would be today. Perhaps. Was he a danger to himself? One of the persons did testify that he would not have wanted to be out on that windy night with the clothes that Gladden had on, didn't he? I wouldn't either. I agree with that. But the expert said that he could walk 6 miles. Who said he could walk 6 miles? Well, Dr. Light. Based on his expert opinion. Light or your expert? Our expert. Gustin? Yes. Who said this guy could have easily walked 6 miles. 60 to 90 minutes? Mr. Gustin's sitting in his office in Berkeley, California when he's talking about this. I agree, and the jury's going to be sitting in a box and having the same information he did. And the point is that... Well, a jury might know a little bit more about weather conditions in Arkansas than Dr. Gustin, who's a gun for hire, you want to call him. Perhaps, Your Honor, but he knows the temperature it takes to die of hypothermia. The jury does not. And that's who they'd be listening to. And the point is... I'm afraid some have more common sense than these experts. Perhaps, Your Honor. What troubles me about this case, one of the things, with all due respect to Chief Judge Miller's opinion, the question presented is whether the officer's violated a clearly established right by giving Gladden a ride to the county line. The answer to that question has to be no. Is that the way to phrase this constitutional question? And if it's not, our opinions have said  in the memorandum analysis, did it really provide a thorough determination of the claim of qualified immunity, as our cases say? We don't like truncated orders. Well, and I don't know that I would have put it as succinctly as he did, but I have given this a lot of... That's why I'm trying to find out from the other counsel, what was the constitutional right that was violated here? I think the constitutional right is, Your Honor, is it clearly established that if someone who is not incapacitated asks for a ride to a certain location and receives... Okay, if he's not clearly... So would you... The converse of that would be if there's a question of fact from which a reasonable jury could find that this person was incapacitated, did it constitute a violation of his constitutional rights to be placed where he was placed that dark, windy night? If we decide based upon what we have before us, including that a reasonable officer should have known that this man was in no position to be dropped off at night at least a half mile from a security house that the man had no knowledge of or that was invisible to him? Well, I believe, if I may, if the question is whether or not you can... If somebody asks to be dropped off at a certain location that you understand to be close to where he lives, and that person is incapacitated, does it violate a clearly established right to do as he asked? Royden makes the point that... I can see this. The police can't just hide behind, well, we gave the person options. Royden, which is a district court case across the river, but still it's a decent case, says you can't... The police can't just say, well, we gave him options if he was too incapacitated to recognize that he had those options. This is not Royden. This is not anywhere near incapacitation. The people talk about intoxication, but Ms. Snowden said he's walking across the street to get lotto tickets, he's singing, he's dancing, he's calling her sweetheart. I mean, he's... My favorite part of the video, Your Honor, is when that yellow sign is in his way. And if he's incapacitated, as Mr. Brewer wants us to believe, which I'm not sure they even says, he navigates that sign with ease. He doesn't stumble over. Excuse me, he navigates what? The sign, the yellow sign in the middle, in his way to the door. He simply steps aside and keeps walking. If there's any point in this where he should have fallen down, where he should have had to hold on to something, that would have been the point, and it's not there. He's simply not incapacitated, and there's nothing in the record to indicate that. Now, the... Had these officers given this man a ride before? Officer Emhoff has. I think I recall in the record that the proof is that this night, he was taken closer to his home than he had... than this officer had previously taken him. It was a bit of a... We're not really sure. Officer Emhoff wasn't sure if he took him to Kerr Road and then drove half a mile away, or took him to Remington Road and drove half a mile away. If it was Kerr Road, then yes, Your Honor, Remington Road is closer to Lone Oak by about... Mr. Brewer may know better, but I think it's about a mile closer to Lone Oak. But again, it's important to note that Richburg talked to Emhoff who said that he had dropped him off at Remington or Kerr before, and that's where Officer Richburg took him, which was ten miles closer. And what was the original destination this evening, this particular night? The county line, which the next exit over the county line is Kerr Road. And when Richburg showed up to Kerr Road, it's dark, and it's very dark. And when you go up to Remington, you may know, Your Honor, when you go up to Remington Road, the Remington plant is very big. And I've been out there at night. You can see that guard shack, but obviously I can't testify to that. But you can see it. It was better lit. I'm not saying it was well lit. It was better lit there. And that guard shack had coffee, heating and air, had a phone that he could have used if he chose to. And this is a man, Mr. Gladden, who goes to strangers' houses and asks for a ride, asks to use the phone. That's his MO. He chose not to do that today. Or that night, I'm sorry. Well, maybe he was in no position to choose. Obviously, when he was found dead, he had indulged in this, engaged in this, I think your client described, Mr. Gustin, Dr. Gustin said, paradoxical undressing. Yes, Your Honor. Take off clothes when a time, when everything else in the rational world would have said, keep them on and ask for, but anyway. Oh, he did ask for clothes, didn't he? That was interesting. We didn't know that. That's what Ms. Snowden said afterward, yes, Your Honor. We didn't know that. Well, back to, and I'll agree with you for purposes of discussion that the facts in this case, in terms of intoxication, are not like Worden, who was, well, anyway. I mean, there are the visible, I mean, the evidence. But anyway, did Chief Judge Miller even discuss whether it was a question of fact regarding Mr. Gladden's intoxication level? Not that I recall, Your Honor. In other words, this is a summary judgment. So we take all the facts in the light most favorable to the non-moving party, and there's testimony about intoxication. So I'm driven back to my own question. Could a reasonable jury, based upon the evidence that we have seen thus far, could they have found that this man was intoxicated to the point that it was constituted deliberate indifference to his safety, his constitutional right to safety, if we want to put it that way, to be dropped off at a dark area at night in a cold, windy night? No, Your Honor. I guess that might be the question before us. Well, perhaps, but there's, when you look back at Worden and Kniep and Munger, these are fall-down drunks. I mean, this guy was not falling down. He was articulating. He didn't get taken from his friends. In the state of Stevens, it was a red herring, the intoxication was a red herring. It's not intoxication, it's incapacitation. And to put the burden on the officers in this gray area, I don't think it's gray, honestly, but at the worst, it's a gray area. To put this burden on the officers that you can't help an intoxicated person, because you can't help an incapacitated person, they had no duty to do anything. They could have let him go, but they chose to try. Of course, it's easy to ask questions or say, I mean, this guy, he could have driven another how far could they have driven to get into the how far would Officer Emberg have had to drive to get Gladden to the security house? Half a, well, .4 miles, I believe, by paved road. Crow flies, probably 2.2. In retrospect, it's easy to say, why didn't the officer do that? He didn't ask to go. Pardon? He didn't ask to go. For all rich persons. Without a sense of humanity, this fellow's intoxicated. Well, anyway. That's a tough burden to put on him. So now the officer has it, as Mr. Brook was a duty to him. Well, I guess tough maybe under 1983 law, in terms of humanitarian principles, one would think it wouldn't have been too tough a duty for him to under, if I may. You may. Under Mr. Brewer's and the plaintiff's theory, the officers have a duty to arrest, a duty to allow him to go back to the Waffle House and make a phone call, a duty not to drop him off where he agreed to go, a duty not just to leave him at the Waffle House, a duty to unlock the door of their own car, a duty to try and commit him. That's the duties that these officers now have. Now, they tried the best they could. It's tragic. I wish that I wouldn't be here. Well, I was thinking of that. I guess maybe Chief Judge Miller said early on in his opinion this is a sad case, a tragic case because the man lost his life. I tell you, Your Honor, and I've thought about this, I would much rather be defending these officers who chose to do something than two officers that just left, kicked him out of the Waffle House, light monger, and he died on the streets there. Thank you, Your Honor. Well... Are you saying, in effect, that Mr. Gladden was better off by himself in the dark than had he stayed at the Waffle House? The question is, was he better off half a mile from his sister's house, which is where the police thought they put him? Or half a mile off from where he had been dropped off before? That's the question. They didn't know he was 15 miles away. I guess I didn't realize that they thought he was within a half mile of his sister's house. Well, half a mile of where he had been dropped off before, which Imhoff understood to be his sister's house. See, Lone Oak is a very amorphous... Well, thank you for your argument. Thank you, Your Honor. If I may briefly... Yes, you may have two minutes, Rick. Thank you, Your Honor. One thing I wanted to point out there, he brought... Council made mention of that Stevens case versus Green Bay. The difference there, Your Honor, is the door was unlocked. That person could come and go out of the back of that car. Mr. Gladden, once he was put in the officer's car, he couldn't get out. And I'm not saying that they had a duty... Where I'm at in this case, Your Honor, is... Sergeant Bibb's email put those officers on notice that Mr. Gladden was incompetent to make decisions and that the department themselves was going to take the steps to civilly commit him. When they got there that evening, they had a claim of someone intoxicated in a business that needed to leave. They could have left him there. The council wants to say, oh, we did a good thing because we took him out of this populated area where he may or may not have gotten beat up. Because if you'll recall in there, Gladden says, I got beat up and they got his shoes on. Do we even know if Gladden's coherent enough to tell the officers what really happened beforehand? But they want to basically say, hey, we took him from the crocodile farm and we threw him in the alligator farm. And so we should be applauded for that. I don't know that arguments like that carry much legal weight. They may be rhetorically flourishing, but I don't think they're... But let's get back to this Officer Bibb memo. What would Officer Richburg and Mr. Gladden in custody under that memo? My understanding of that memo, Your Honor, is... What your understanding is, what does it say? It's asking them to fill out a form 925, give explicit succinct, detailed events, chronological of what it was, how he was intoxicated, what he had been doing, so they could go to show a judge that this man was incompetent and was a danger to himself and his family. Thank you, Your Honor. Well, we thank both sides for the arguments. As Chief Judge Miller said, it is a sad case, a tragic case, and it's now submitted and we will take it under consideration.